# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Estate of Hanley*, 2013 IL App (3d) 110264

---

| | |
|---|---|
| Appellate Court Caption | *In Re* ESTATE OF JOHN P. HANLEY, an Alleged Disabled Person, Respondent-Appellee, (James Hanley, Petitioner-Appellant and Cross-Appellee, v. Margaret Hanley, Respondent-Appellee and Cross-Appellant). |
| District & No. | Third District<br>Docket Nos. 3-11-0264, 3-11-0932 cons. |
| Filed | September 6, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action seeking a guardianship for petitioner's father and an order of protection against petitioner's sister, the trial court properly dismissed the petitions, since petitioner did not present any facts rebutting the affirmative matter respondent presented establishing that he was capable of managing his affairs, even though he was a high-risk adult with disabilities; furthermore, he did not have a guardian, he had never been adjudicated an incompetent adult, and pursuant to section 103(2) of the Domestic Violence Act, no proceedings on behalf of such an adult could proceed without the approval of his guardian. |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 10-P-493; the Hon. Michael E. Brandt, Judge, presiding. |
| Judgment | Affirmed in part, corrected in part, and sanctions on appeal denied. |

Counsel on
Appeal

William R. Kohlhase and Mark D. Walton (argued), both of Miller, Hall & Triggs, of Peoria, for appellant.

Susan Dawson-Tibbits, of Johnson, Bunce & Noble, P.C., and David B. Radley (argued), both of Peoria, for appellee John P. Hanley.

J. Reed Roesler (argued), of Davis & Campbell, of Peoria, for appellee Margaret Hanley.

Panel

JUSTICE McDADE delivered the judgment of the court, with opinion.

Justices Holdridge and Schmidt concurred in the judgment and opinion.

**OPINION**

¶ 1     This appeal has proceeded in two stages: first, James's challenge to the dismissal of his petitions for guardianship and an order of protection and second, the appeal by James and cross-appeal by Margaret of the matter of sanctions. Separate briefing was submitted and oral arguments were separately heard at each stage.

¶ 2     The petitioner, James Hanley, filed a two-count petition for the appointment of guardians for his father, John P. Hanley (count I), and for an order of protection against the respondent, Margaret Hanley, who is James's sister and John's daughter (count II). John and Margaret separately moved to dismiss the count of James's petition which pertained to each. The trial court granted both motions to dismiss. James appeals the dismissals, contending that the trial court erred because: (1) evidence presented by John was insufficient to support dismissal under section 2-619 of the Code of Civil Procedure (the Code) (735 ILCS 5/2-619 (West 2010)); (2) the petition alleged sufficient facts under section 2-615 (735 ILCS 5/2-615 (West 2010)) of the Code to state claims for guardianship and an order of protection, and to preclude dismissal under the terms of the Probate Act of 1975 (the Probate Act) (755 ILCS 5/1-1 *et seq.* (West 2010)); and (3) the court failed to adjudicate John's need for a guardian, precluding dismissal of James's request for an order of protection under section 103(2) of the Illinois Domestic Violence Act of 1986 (Domestic Violence Act) (750 ILCS 60/103(2) (West 2010)). We affirm the trial court on these dismissals.

¶ 3     Following dismissal, separate motions for sanctions were filed by John and Margaret against James in the trial court. The court denied the motion filed by John but awarded sanctions to Margaret. John did not appeal the denial of his sanction motion; however, James has appealed from the award of sanctions to Margaret, claiming that the trial court erred when it (1) denied his motion to strike John's and Margaret's motions for sanctions for

failure to identify false statements in his petition; and (2) placed the burden of production of evidence with James. James also contends the trial court abused its discretion when it granted Margaret's motion for sanctions because (3) it rendered the decision based on untimely facts and unasserted grounds, in the absence of any false allegations, and despite James's objectively reasonable basis for filing his petition; and when it awarded attorney fees to Margaret because (4) she did not pay her own fees and (5) the court did not permit James's counsel to question Margaret's counsel.

¶ 4       Margaret has cross-appealed on sanctions contending that the trial court made an inadvertent error when it computed the attorney fees it awarded her and that this court should correct the error.

¶ 5       We affirm the award of sanctions and correct the amount of the award.

¶ 6       Margaret has also moved in this court for Illinois Supreme Court Rule 375(b) (eff. Feb. 1, 1994) sanctions against James for bringing the instant appeal. We deny that request.

¶ 7                    FAMILY AND PROCEDURAL HISTORY

¶ 8       John P. Hanley was 76 years old at the time the petition for guardianship and order of protection was filed. He is the widowed father of 10 adult children–5 daughters and 5 sons. He made his residence with his daughter, Maureen Smith, and her husband Tom.

¶ 9       In 1992, John severed business and personal relationships with his sons, including the petitioner, James, and at the time the petition was filed, that estrangement had persisted for 18 years. Prior to the break, John began removing some family members from employment at his business, A. Lucas & Sons (Lucas). His son, Peter Hanley, set up a competing business and John cut off relationships with Peter and all family members who aligned themselves with him.

¶ 10      The continued existence of the estrangement was confirmed in court proceedings in the spring of 2005 and in the following August 1, 2008, letter John sent to his sons:

"Peter, Andy, Jim, John & Tom.

   I do not wish to communicate with you at this time.

   Your lack of integrity and dishonesty have been too large a part of my life. I have moved on and I would ask you to try and do the same.

   If my feelings should change I will contact you."

¶ 11      Regardless of the 18-year estrangement and the fact that John had taken legal steps to delegate decisions about his property and his health in the event of his incapacity, James filed a two-count petition on November 3, 2010, seeking to be appointed guardian of his father's person and to have Commerce Bank appointed guardian of his estate. He also sought an order of protection on John's behalf against Margaret. Nearly all salient allegations in the petition are made on information and belief.

¶ 12      In count I, James alleged that John was incapable of managing either his person or his estate because of age and infirmity; did not currently have a guardian or an agent under the Illinois Power of Attorney Act (755 ILCS 45/1-1 *et seq.* (West 2010)); and was a widower who resided with his daughter Maureen and her husband. James did not attach the required

-3-

medical report to this petition, but requested, as allowed by statute, that the court order "appropriate evaluations" of John.

¶ 13    In count II, James alleged that: (1) John was "a high risk disabled adult as defined in 750 ILCS 60/103"; (2) John is or was the majority shareholder of Lucas; (3) Margaret was the president (and possibly a stockholder/director) of Lucas; (4) because John, on account of age and infirmity, relied on Margaret for assistance with his personal and business affairs and she dominated and controlled those affairs and, in concert with Maureen, curtailed John's interactions with family and friends, Margaret stood in a fiduciary relationship with, and owed a fiduciary duty to, John.

¶ 14    Count II further alleged Margaret's breach of fiduciary duty by diverting business from Lucas to companies in which she had an ownership or financial interest and John did not, by permitting waste of John's assets, and by making decisions that were inconsistent with those John would make were he capable and not under Margaret's influence. James characterized Margaret's conduct as exploitation. He also requested an accounting of John's assets.

¶ 15    John moved to dismiss James's petition pursuant to sections 2-615 (735 ILCS 5/2-615 (West 2010)) and 2-619 (735 ILCS 5/2-619 (West 2010)). He challenged the trial court's jurisdiction to appoint a guardian because he had previously executed powers of attorney for property and health care. He asserted his lack of disability as affirmative matter under section 2-619 (735 ILCS 5/2-619 (West 2010)) and the failure of the petition to state a cause of action under section 2-615 (735 ILCS 5/2-615 (West 2010)).

¶ 16    John supported his section 2-619 motion with a medical report from Dr. Shanta Mattai in which the neurologist recounted her five-year history of treating John, her observations of his physical and emotional condition, his adaptability to his surroundings, and his compliance with medical instructions. She noted that John "had an intact mental status as determined by the mini-mental status examination [(MMSE)]," and indicated that any neurological deficit John experienced did not significantly impact his ability to make decisions about his person or estate. She opined that John was happy in his current living environment and that it should not be changed. Overall, Dr. Mattai concluded that John did not need a guardian.

¶ 17    John's own affidavit averred that he had experienced two seizures, one in 2005 and the other in early 2010. Although they had "cause[d him] to slow down," they had not impaired his mental faculties or his abilities to drive and walk, and to care for himself. John further averred that he currently lived with Maureen and her husband, and they were available to help him if needed. He attached powers of attorney for health care and property that he had executed on September 11, 2009, naming Margaret as his agent, and Maureen as successor, and stated that his chosen agents would care for him should the need arise. John further averred that he had not seen or communicated with James in approximately 18 years, other than to send the August 2008 letter.

¶ 18    Margaret also moved to dismiss James's petition pursuant to sections 2-615 (735 ILCS 5/2-615 (West 2010)) and 2-619 (735 ILCS 5/2-619 (West 2010)). She argued dismissal was warranted under section 2-615 (735 ILCS 5/2-615 (West 2010)) because the petition concluded, without supporting facts, that John was a "high risk adult with disabilities," and

under section 2-619 (735 ILCS 5/2-619 (West 2010)) because John objected to the appointment of a guardian, and, pursuant to section 103(2) of the Domestic Violence Act, "no court proceeding may be initiated or continued on behalf of an adult with disabilities over the adult's objection, unless such proceeding is approved by his or her legal guardian, if any" (750 ILCS 60/103(2) (West 2010)). She attached John's certification objecting to the court proceeding seeking an order of protection on his behalf against Margaret and asking that the proceeding be dismissed.

¶ 19     James responded, contending he had pled sufficient facts to state a cause of action in both counts, denying that John's execution of powers of attorney deprived the court of jurisdiction to hear his guardianship petition, and arguing that count II should not be dismissed without a determination by the court that John was capable of managing his own estate.

¶ 20     John supplemented his motion to dismiss, arguing that the cases of *In re Estate of Silverman*, 257 Ill. App. 3d 162 (1993), and *Williams v. Estate of Cole*, 393 Ill. App. 3d 771 (2009), controlled the disposition of this case; that James's sole purpose was to gain control over John's assets, and that the allegation of infirmity was unsupported and insufficient to warrant guardianship; and attaching the medical report of Dr. Robert A. Lizer, who had also been his physician for five years. Dr. Lizer concluded that John had recovered from his falls, enjoyed a "normal" mental status, was able to safely operate a vehicle and fulfill his basic personal needs, and was "mentally capable of making his own decisions."

¶ 21     John later filed affidavits of Dr. Mattai and Dr. Lizer which mirrored the substantive information contained in each doctor's report and recited that each could competently testify to the information if necessary.

¶ 22     James, supported by an affidavit of Dr. Sanford Finkel, who had neither talked with nor examined John, challenged the factual bases for and the sufficiency of the reports and affidavits of Dr. Lizer and Dr. Mattai. Dr. Finkel also questioned the doctors' failure to provide detailed information on the nature and management of John's finances, and asserted that more thorough mental health testing of John was necessary.

¶ 23     Second, James contended his allegation that John could not manage his estate due to age or infirmity satisfied the applicable pleading requirements of the Probate Act, which only required him to plead the reasons for guardianship to the extent that he knew them.

¶ 24     James also attached affidavits from two of John's siblings and two of John's other estranged sons alleging changes in John's demeanor and relationships with family members primarily in 2005 and 2006, following his head injury.

¶ 25     On January 21, 2010, the court appointed attorney Jeremy Heiple as guardian *ad litem* for John. Heiple met twice with John and also met with John's five sons and with one of his brothers. He found John to be "fully oriented to person, place and time," and noted that Dr. Mattai and Dr. Lizer had issued separate reports indicating that John "ha[d] sufficiently recovered from the 2005 matters such that he [was] competent to make all of his own decisions, both medical and otherwise." During his second meeting with John, Heiple administered the MMSE on which John scored 29 of 30 possible points, indicating he had "no cognitive impairment." A copy of the test was appended to his report.

¶ 26     Heiple also noted "significant relational dysfunction" within John's family, which had

originated in 1992 with the terminations from Lucas, and Peter's decision to open a competing business. The dysfunction intensified during and after 2005 legal proceedings in which Margaret and her sister Mary had sought orders of protection against their brothers, and the family members had been advised by the court "to just stay away from each other." Heiple also included a copy of the handwritten August 2008 letter from John to his five sons.

¶ 27    John told Heiple he wanted the guardianship proceedings to be dismissed; he had no present need for a guardian and had created powers of attorney should he ever need assistance. Heiple reported that he had no information indicating that either Margaret or Maureen would be an inappropriate agent for John, and stated that John's living arrangement was appropriate, and he had no need for a nursing home or assisted living.

¶ 28    With regard to his meetings with John's estranged children, Heiple noted they had vague concerns about John's well-being based solely on conjecture. He opined that "the gravamen of their interest seemed to focus on the operation of [John's] business, A. Lucas & Sons, as well as [John's] finances."

¶ 29    On March 16, 2011, the court entered its written order dismissing both counts of James's petition with prejudice. The order recited that there had been a hearing on the motions to dismiss with counsel present and arguments heard. After rejecting John's jurisdictional challenge, the order dismissed count I, finding the claim "barred by other affirmative matter avoiding the legal effect of or defeating the claim." The court found that James had not attached any medical report or affidavits establishing disability as defined in the statute, while John had submitted medical reports and affidavits of Dr. Lizer and Dr. Mattai which complied with the statute and which asserted facts refuting John's alleged disability.

¶ 30    Count II, against Margaret, was dismissed based on the court's finding that John's objection to the entry of an order of protection precluded the continuation of proceedings under section 103(2) of the Domestic Violence Act (750 ILCS 60/103(2) (West 2010)).

¶ 31    Following the dismissal of James's petition, John and Margaret separately sought sanctions under Illinois Supreme Court Rule 137 (eff. Feb. 1, 1994). John's motion alleged that James's petition was neither well grounded in fact nor warranted by existing law, but had been filed for the improper purpose of harassing John and using discovery to gain information about Lucas to which he was not entitled. Margaret's motion recounted the family's long history of dissension and alleged that: James had not seen or spoken to John for 18 years; he was a project manager at Hanley Steel, a business he and his four brothers have operated in direct competition with Lucas; the petition lacked "the facts [or] the proper purpose to pursue the claims" advanced; the allegations in his petition were "completely without substance or merit," and James had a conflict of interest. She claimed that James had abused the process of the court and that sanctions were warranted.

¶ 32    James responded with motions to strike each sanction motion and, alternatively, a request that the court set the matter for discovery and an evidentiary hearing.

¶ 33    At the initial hearing on the motions for sanctions on July 11, 2011, the court found that Margaret and John had each presented a *prima facie* case for sanctions for James's failure to make a reasonable inquiry concerning his petition for a guardian and for an order of protection. The court concluded that additional discovery was not appropriate but scheduled

a hearing at which the parties would be permitted to present supplemental evidence and arguments regarding sanctions.

¶ 34    That hearing convened on September 30, 2011. The court noted that since it had previously found John and Margaret met the threshold requirements for sanctions, James must be given the opportunity to rebut their allegations and show that sanctions were not appropriate. Claiming that Margaret had only presented "a pile of hearsay," James objected "to the burden being shifted to [him] without any evidence being presented."

¶ 35    The pertinent facts elicited from testimony at this hearing showed that John and James had been estranged for 18 years, during which time they had never spoken. James had not asked John if he wanted or needed a guardian, had not secured a medical evaluation or medical information about John prior to filing his petition, had not made any effort to ascertain whether John's failure to acknowledge family members or his claimed "isolation" from them was volitional or imposed by others, and had not tried to determine whether John was dissatisfied with Margaret's handling of Lucas or wanted/needed an order of protection. There was undisputed evidence that John had, in writing, severed ties with his sons and disputed testimony that after receiving the August 2008 letter James disavowed any relationship with his father.[1] It was also undisputed that Lucas and Hanley Steel, which employed James as a project manager, were direct business competitors. James's "perception" of John's disability was anecdotal, based on his own sporadic sightings or those of others–some of whom were as estranged from John as he. James's expert offered no independent opinion about John's condition based on his own examination of John but only criticized the evidence considered by and opinions tendered by John's personal treating physicians.

¶ 36    On October 4, 2011, in a written order, John's motion for sanctions was denied, with the court finding that, although James presented a "very, very weak case" for the appointment of a guardian, his conduct with regard to count I did not warrant the imposition of sanctions.

¶ 37    Sanctions were, however, awarded to Margaret. The order noted that section 103(2) of the Domestic Violence Act (750 ILCS 60/103(2) (West 2010)) precluded the initiation or continuation of proceedings for an order of protection on behalf of an adult with disabilities over that adult's objections. The court found that James made no attempt to determine whether John wanted him to initiate the domestic violence proceedings and that even after John filed the affidavit objecting to the proceedings, James persisted. The court further concluded that James had not presented "even an iota of evidence suggesting any component of abuse, neglect, harassment, exploitation, or interference with personal liberty." A hearing was scheduled for determination of fees and costs.

¶ 38    Margaret's initial petition for attorney fees and costs sought a total of $42,596.24 for work done through September 30, 2011. A supplemental petition for $4,741.42 covered work after October l, 2011. James objected to any fees incurred for work on the appeal of the

---

[1]James's brother, Tom Hanley, testified that, after receiving the August 2008 letter from John, James stated that he did not care if he ever spoke to John again and as far as he (James) was concerned, he did not have a father. James has denied making that statement.

dismissal of James's petition, on issues on behalf of Lucas, on Peter's conduct, and on count I of James's petition. In support of her fee petition, Margaret testified that, although Lucas was initially paying her fees, she was obligated to reimburse the company. James's effort to call Margaret's attorney as a witness was denied by the trial court.

¶ 39    By order of December 15, 2011, after reducing her $42,596.24 fee petition by $12,951.41 in fees and costs relating to the pending appeal or not reasonably related to the instant litigation, the trial court awarded Margaret $29,644.83.

¶ 40    Margaret has also sought sanctions in this court pursuant to Illinois Supreme Court Rule 375(b) (eff. Feb. 1, 1994), alleging that James's appeal is frivolous because his "underlying case is baseless, is in direct contravention of the applicable statute, and has never been supported with 'even an iota of evidence.' It is equally frivolous here on appeal."

¶ 41    James responds that Margaret has made no allegations specific to the appeal and denies that the court found count II frivolous but rather granted sanctions because James prosecuted it over John's objection. James contends a principled argument has been advanced on appeal for a favorable interpretation of section 103(2) of the Domestic Violence Act (750 ILCS 60/103(2) (West 2010)). Therefore, he asserts that the appeal is not frivolous and sanctions are not warranted.

¶ 42                                                ANALYSIS

¶ 43    Before proceeding with our analysis of the substantive issues, we note Margaret's challenge to this court's jurisdiction because the trial court had not ruled on subsequently filed motions for sanctions prior to the filing of the notice of appeal on April 13, 2011. Pursuant to Illinois Supreme Court Rule 303(a)(2) (eff. June 4, 2008), when the court renders a decision on a timely filed postjudgment motion, such as a motion for sanctions, a premature notice of appeal takes effect when the court enters the order disposing of the posttrial matter. In the instant case, the sanctions motion was granted on October 4, 2011, and the award was entered on December 15, 2011, at which time the notice of appeal became effective. Thus, this court has proper jurisdiction.

¶ 44                        I. Dismissal of Petition for Guardianship

¶ 45    James has appealed from the dismissal with prejudice of both counts of his petition pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2010)).[2] Section 2-619 permits involuntary dismissal of an action where "the claim asserted against [the] defendant is barred by *** [an] affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2010). An "affirmative matter" is something in the nature of a defense that completely negates the cause of action or refutes crucial conclusions of law. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2003).

---

[2]James argues his petition stated a claim under section 2-615 (735 ILCS 5/2-615 (West 2010)). The dismissals were pursuant to section 2-619 (735 ILCS 5/2-619 (West 2010)). We affirm on that basis and do not reach the section 2-615 (735 ILCS 5/2-615 (West 2010)) challenges.

Our review of an order of dismissal is *de novo. Goldberg v. Michael*, 328 Ill. App. 3d 593, 597 (2002).

¶ 46                    A. Dismissal of Count I–Section 2-619

¶ 47       In its order of dismissal, the trial court found count I of James's petition barred under section 2-619 (735 ILCS 5/2-619(a)(9) (West 2010))[3] because the sworn, statutorily compliant affidavits of Dr. Mattai and Dr. Lizer established John's lack of disability on the basis of current assessments. It also found that these reports were not successfully countered by the affidavit of James's medical expert, Dr. Finkel, nor those of four of John's relatives because they were "remote and [did] not establish a suggestion of current disability as defined by the statute." The court concluded John had successfully proven the existence of affirmative matter defeating the claim. For the reasons that follow, we agree.

¶ 48       In his petition, James sought guardianship pursuant to procedures set out in the Probate Act of 1975 (755 ILCS 5/1-1 *et seq.* (West 2010)). Section 11a-3(a) provides in pertinent part:

> "Upon the filing of a petition by a reputable person ***, the court may adjudge a person to be a disabled person, but only if it has been demonstrated by clear and convincing evidence that the person is a disabled person as defined in Section 11a-2." 755 ILCS 5/11a-3(a) (West 2010).

Section 11a-2 defines a "disabled person," as:

> "[A] person 18 years of age or older who *** because of mental deterioration or physical incapacity is not fully able to manage his person or estate ***." 755 ILCS 5/11a-2 (West 2010).

¶ 49       The record in the instant case reveals a plethora of evidence supporting the trial court's dismissal of James's petition for guardianship. Dr. Mattai and Dr. Lizer both submitted affidavits opining that John was capable of managing his person and estate without the assistance of a guardian. Dr. Mattai expressly noted that John "had an intact mental status as determined by the MMSE." While James did not attach a section 11a-9(a) (755 ILCS 5/11a-9(a) (West 2010))[4] affidavit to his petition for guardianship, both the affidavits of Dr.

---

[3] Section 2-619 permits involuntary dismissal of an action where "the claim asserted against [the] defendant is barred by [an] affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2010).

[4] Section 11a-9(a) provides:

> "The petition for adjudication of disability and for appointment of a guardian should be accompanied by a report which contains (1) a description of the nature and type of the respondent's disability and an assessment of how the disability impacts on the ability of the respondent to make decisions or to function independently; (2) an analysis and results of evaluations of the respondent's mental and physical condition and, where appropriate, educational condition, adaptive behavior and social skills, which have been performed within 3 months of the date

Mattai and Dr. Lizer contain discussion of all relevant section 11a-9(a) factors.

¶ 50      We reject James's claim that the lack of medical records or other documents (except the *curriculum vitae* of each) attached to the affidavits acts to invalidate them. Affidavits submitted in conjunction with a section 2-619 motion are governed by Illinois Supreme Court Rule 191(a) (eff. July 1, 2002). Rule 191(a) provides, in pertinent part:

> "Affidavits *** shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all documents upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." Ill. S. Ct. R. 191(a) (eff. July 1, 2002).

¶ 51      We acknowledge that Rule 191(a) requires the attachment of "sworn or certified copies of all papers upon which the affiant relies." With the sole exception of the MMSE, however, it appears that both doctors are relying, not on specific tests or documents but on their treatment of and routine interaction with John over a period of five years, observing him while assisting his recovery from the effects of two seizures. Their assessments of his abilities are based on personal observation of his efforts and his skills in coping with his seizures, and the extent to which he has or has not overcome any deficits resulting from his falls or the natural processes of aging. Such personal observation and knowledge is an expressly sufficient foundation for an affidavit. Moreover, we emphasize that the failure to attach documents (such as the MMSE itself) to an affidavit is a technical violation of the rule which should be disregarded when it appears that the affiant would be competent to testify at trial. *Andrews v. Northwestern Memorial Hospital*, 184 Ill. App. 3d 486, 492 (1989).

¶ 52      Dr. Mattai and Dr. Lizer each averred that he or she was competent to testify at trial. Moreover, their *curricula vitae* establish that they are medical professionals licensed in the State of Illinois and with significant experience in their areas of practice. The affidavits assert actual doctor/patient relationships with John since 2005 (five years) with opportunities to observe, assess, and monitor his condition during all of the relevant times. Moreover, their evaluations are current; prior to executing their affidavits, John's last appointment with Dr. Mattai was November 30, 2010, and with Dr. Lizer was December 6, 2010. They are clearly competent to testify if called upon to do so. We find, as did the trial court, that the affidavits of Dr. Mattai and Dr. Lizer complied with Illinois Supreme Court Rule 191(a) (eff. July 1, 2002).

---

of the filing of the petition; (3) an opinion as to whether guardianship is needed, the type and scope of the guardianship needed, and the reasons therefor; (4) a recommendation as to the most suitable living arrangement and, where appropriate, treatment or habilitation plan for the respondent and the reasons therefor; (5) the signatures of all persons who performed the evaluations upon which the report is based, one of whom shall be a licensed physician and a statement of the certification, license, or other credentials that qualify the evaluators who prepared the report." 755 ILCS 5/11a-9(a) (West 2010).

¶ 53    The record also reveals that Jeremy Heiple, John's court-appointed GAL, also believed John was capable of independently managing his person and estate. Heiple reported John scored 29 out of a possible 30 points on an attached MMSE, indicating the absence of cognitive impairment; that while the estranged children with whom he met expressed "vague concerns" about John's well-being, the "gravamen of their interest" seemed to focus on the operation of Lucas and on John's finances.

¶ 54    The record also contains John's own affidavit, which we find pertinent to the issue of his ability to manage his business and personal financial affairs. The affidavit demonstrates that: John recognized that his wife's death in 2009 necessitated changes in his estate plan; he has retained counsel for financial planning for many years; he used that attorney for the update of his estate plan, which included revisions to his will and an *inter vivos* trust and the execution of several documents to prepare for potential contingencies–a living will, a power of attorney for health care, a separate power of attorney for the comprehensive management of his estate. His actions portray a person cognizant of his financial responsibilities, capable of addressing current issues with his estate, and foresightful enough to recognize the realities of aging and to plan for resulting exigencies if or when they arise.

¶ 55    We find John's burden of producing affirmative matter that would defeat James's claim was satisfied, and the burden shifted to James to show the affirmative matter is either unfounded or requires the resolution of essential, material facts before it is proven. *Brady v. Prairie Material Sales, Inc.*, 190 Ill. App. 3d 571, 579 (1989). James argues that the affidavits he produced raised material questions of fact and that the existence of those factual disputes precluded dismissal of his petition. We disagree.

¶ 56    In assessing whether James has successfully rebutted John's affirmative matter, we consider: his allegations in his petition and the affidavits of John's two sons, Andrew and John; of John's brother Joseph and his sister Jane Myrna; and of Dr. Finkel.

¶ 57    James's petition alleged, without any supporting medical facts, that John was not fully capable of managing his person or estate due to age and infirmity. He asserted, on information and belief: that John had neither a guardian nor agents under any power of attorney; that the house in which John resided with Maureen and Tom was John's by virtue of a beneficial interest in a trust; and the dollar value of John's real property and estate, but it conceded ignorance of John's anticipated gross income. There are no *facts* in the petition that militate against John's affirmative matter.

¶ 58    We find, as did the trial court, that the affidavits of John's brother and sister and two of his sons are remote in time and not suggestive of a present disability. John's brother Joseph averred that John stopped attending family meetings in February 2005, that in 2006 he looked dazed and was staring at the floor, that in June 2009 he did not speak to Joseph and his wife at John's wife's funeral; that he did not attend his brother Bob's funeral in September 2009. At unspecified times, he had seen John being driven in his own car. John's sister Jane's affidavit plainly establishes that she has not spoken with him since 2005, claiming he has never accepted or returned her calls.

¶ 59    The affidavit of John's son, Andrew, alleged unresponsiveness in 2005 and 2006 but nothing current. His son John recalled a confused phone call from John but stated that he had

not seen his father since December 2005. There is nothing in the four affidavits that establishes disability or is inconsistent with the estrangement from some family members which significantly predated John's falls or seizures or which differs from past deficits that his doctors averred had been successfully resolved. None of these affidavits puts John's current mental condition in issue or requires resolution of factual disputes.

¶ 60　　Dr. Finkel's 36-page affidavit vigorously criticizes alleged deficiencies in and absence of documentary support for the affidavits of Dr. Mattai and Dr. Lizer. He lists a number of tests he asserts are essential in adequately evaluating John's mental, physical, and financial abilities. Yet Dr. Finkel, who never spoke with or examined John, does not present a single fact to support a conclusion that John is, in fact, disabled due to age or infirmity or to refute any conclusions of John's doctors based on their personal knowledge and their routine, continuous treatment of their patient over a five-year period.

¶ 61　　We find that the allegations in James's petition and the supporting affidavits that he has submitted, even when viewed in the light most favorable to him, do not rebut–or even meaningfully challenge–the affirmative matter shown by John.

¶ 62　　James's final challenge to the trial court's dismissal is the claimed error of the court's reliance on the cases of *Williams v. Estate of Cole*, 393 Ill. App. 3d 771 (2009), and *In re Estate of Silverman*, 257 Ill. App. 3d 162 (1993), to validate the use of the medical reports submitted by Dr. Mattai and Dr. Lizer. Instead, James believes that because he did not include a medical report with his petition for guardianship, the trial court should have ordered an independent evaluation under section 11a-9(b) of the Probate Act (755 ILCS 5/11a-9(b) (West 2010)). Section 11a-9(b) provides:

> "If for any reason no [medical] report accompanies the petition, the court shall order appropriate evaluations to be performed by a qualified person or persons and a report prepared and filed with the court at least 10 days prior to the hearing." 755 ILCS 5/11a-9(b) (West 2010).

¶ 63　　In *Williams*, a daughter (the petitioner) petitioned for guardianship of her mother (the respondent). The petitioner did not attach a medical report to the petition. The respondent moved to dismiss and attached medical reports from two of her doctors stating that she was not impaired. The petitioner filed a motion for an independent examination of the respondent supported by an affidavit from Dr. Sanford Finkel, who had not personally examined the respondent, stating that he had reviewed various documents and opined that the respondent was unable to make reasoned decisions. The trial court granted the motion to dismiss and declined to order the requested exam. *Williams*, 393 Ill. App. 3d at 774.

¶ 64　　The appellate court affirmed the dismissal, rejecting the petitioner's argument that the trial court was required to order an additional evaluation of the respondent. *Williams*, 393 Ill. App. 3d at 780. The court found that such an evaluation is not necessary "where respondents come forward with 'statutorily sufficient reports.' " *Williams*, 393 Ill. App. 3d at 780 (quoting *Silverman*, 257 Ill. App. 3d at 171).

¶ 65　　In *Silverman*, the respondent moved to dismiss a petition for guardianship filed by his brother (the petitioner). The motion to dismiss included a report from the respondent's doctor, who averred that he had treated the respondent for over 30 years and that the

respondent was mentally competent and able to make his own personal and financial decisions. The GAL opined that the respondent did not need a guardian. The petitioner filed a motion to strike the doctor's affidavit. The trial court denied the petitioner's motion to strike, but did allow the petitioner to take the doctor's deposition. *Silverman*, 257 Ill. App. 3d at 168. The court considered both the report and deposition in reaching its decision to grant the motion to dismiss. *Silverman*, 257 Ill. App. 3d at 168.

¶ 66 The appellate court affirmed the dismissal. *Silverman*, 257 Ill. App. 3d at 173. The court found that even though the respondent's doctor had not asked questions about her financial affairs and his report was not exhaustive, the doctor had a long history with the respondent and made his evaluation in the context of that relationship, the report was reliable, it complied with the statutory requirements and was properly considered at the guardianship hearing. *Silverman*, 257 Ill. App. 3d at 168-69. Because the respondent had presented a statutorily sufficient report indicating she was mentally competent, and the petitioner had not met her burden of showing that this affirmative matter was unfounded or required the resolution of a material fact, the appellate court concluded:

> "We do not believe that the code provision requiring courts to order evaluations when petitions lack medical reports mandates such orders when respondents come forward with statutorily sufficient reports. The clear purpose of the provision is to ensure that the court adjudicates disability based upon a reliable evaluation of the subject's physical and mental status." *Silverman*, 257 Ill. App. 3d at 171.

¶ 67 In the instant case, we have found that Dr. Mattai and Dr. Lizer are medical professionals licensed to practice in Illinois, that each had treated John for five years beginning with the year of his first seizure in 2005 and continuing after the initiation of the guardianship action; that the report submitted by each doctor expressly addresses each of the relevant elements in section 11a-9 (755 ILCS 5/11a-9 (West 2010)). We have also determined that the affidavits of the two doctors are sufficiently compliant with Illinois Supreme Court Rule 191(a) (eff. July 1, 2002). We, therefore, conclude that the decision not to subject John to further unwarranted mental and physical evaluation is fully supported by *Williams* and *Silverman.*

¶ 68 Accordingly, we hold that the dismissal of count I of James's petition for guardianship was proper.

¶ 69        B. Dismissal of Count II–Section 2-619

¶ 70 The trial court's dismissal order stated:

> "As to count II, it is ordered that it is dismissed with prejudice. The alleged adult/disabled victim objects to an order of protection. See 750 ILCS 60/103."

There is no other reference to count II in the order.

¶ 71 Margaret's objection to count II is based on section 103(2) of the Domestic Violence Act, which provides:

> " 'Adult with disabilities' means *** a high-risk adult with disabilities. A person may be an adult with disabilities for purposes of this Act even though he or she has never

-13-

been adjudicated an incompetent adult. However, no court proceeding may be initiated or continued on behalf of an adult with disabilities over that adult's objection, unless such proceeding is approved by his or her legal guardian, if any." 750 ILCS 60/103(2) (West 2010).

¶ 72     In language that is permissive, not mandatory, section 11a-10.1 of the Probate Act (755 ILCS 5/11a-10.1 (West 2010)) expressly authorizes the pursuit of appointment of a guardian and an order of protection in the same proceeding if, as is the case here, the petition alleges abuse, neglect or exploitation of the subject of the adjudication proceedings. We have not found, nor has James cited, any language stating or implying that this permissive joinder under the Probate Act (755 ILCS 5/11a-10.1 (West 2010)) nullifies the clear directive of the Domestic Violence Act (750 ILCS 60/103(2) (West 2010)) if John objects to the proceeding. Indeed, the prohibition against continuing in the face of an objection appears in the same sentence with a clear presupposition that the objector is a "high risk" disabled adult who may not as yet have been adjudicated or have a guardian. See 750 ILCS 60/103(2) (West 2010). Even were we to ignore the plain statutory language, we cannot see how the two claims are so inextricably interwoven that either one must be maintained for the resolution of the other. Nor can we find a basis for concluding that a petitioner faced with an objection is left without any remedy. In such an event, the order of protection claim could be voluntarily dismissed without prejudice and could be reinstated by the petitioner if a guardian is deemed necessary and if that guardian believes pursuit of the order of protection is warranted. Or the newly appointed guardian can institute proceedings for an order of protection independently if he/she finds it warranted.

¶ 73     Here, although James's petition alleges that John is a high risk adult with disabilities who is being exploited by Margaret, it also concedes, on information and belief, that John does not have a guardian. Accepting these allegations as true, John is a high risk adult with disabilities who has no guardian. He prepared an affidavit, attached to Margaret's motion to dismiss, in which he "object[ed] to both the initiation and continuation of the court proceeding seeking an order of protection on my behalf against Margaret Hanley," and asked that the proceeding be dismissed. Thus, the proceeding could only continue if John's objection was overridden by his guardian. See 750 ILCS 60/103(2) (West 2010). Since he has no guardian, the objection is dispositive because it stands as an affirmative matter defeating James' request for guardianship.

¶ 74     Accordingly, we hold that the dismissal of count I of James's petition for guardianship was proper.


¶ 75                              II. Sanctions in the Circuit Court

¶ 76     Following dismissal of James's petition, Margaret filed a motion for sanctions, pursuant to Illinois Supreme Court Rule 137 (eff. Feb. 1, 1994). The trial court granted the motion, ultimately awarding her fees in the amount of $29,644.83.

¶ 77     Illinois Supreme Court Rule 137 (eff. Feb. 1, 1994) provides in pertinent part:

    "The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion or other paper; that to the best of his knowledge, information, and belief

-14-

formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. *** If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, may impose upon the person who signed it, a represented party, or both, an appropriate sanction *** including a reasonable attorney fee."

¶ 78      James has appealed, challenging the decision on four bases. We review the four challenges to the trial court's decision awarding sanctions for an abuse of discretion. *Whitmer v. Munson*, 335 Ill. App. 3d 501, 514 (2002). Abuse of discretion occurs when no reasonable person could take the view adopted by the trial court. *Whitmer*, 335 Ill. App. 3d at 514. "When reviewing a decision on a motion for sanctions, the primary consideration is whether the trial court's decision was informed, based on valid reasoning, and follows logically from the facts." *Technology Innovation Center, Inc. v. Multiuser Technologies Corp.*, 315 Ill. App. 3d 238, 244 (2000).

¶ 79      The purpose of Rule 137 is to prevent the filing of lawsuits without legal or factual foundation, and not to penalize an attorney who is zealous but unsuccessful. *Shea, Rogal & Associates, Ltd. v. Leslie Volkswagen, Inc.*, 250 Ill. App. 3d 149, 153 (1993). The rule is intended to prohibit the abuse of the judicial process by a litigant who makes a vexatious or harassing claim based on unsupported allegations of law or fact. *Fremarek v. John Hancock Mutual Life Insurance Co.*, 272 Ill. App. 3d 1067, 1074 (1995). Since Rule 137 is penal in nature, it should be strictly construed. *In re Marriage of Adler*, 271 Ill. App. 3d 469, 475 (1995).

¶ 80      Illinois Supreme Court Rule 137 (eff. Feb. 1, 1994) mandates that signing attorneys or parties make reasonable inquiry into the basis for a pleading before filing it. In evaluating the signing party's conduct in this regard, a trial court must consider reasonableness based upon circumstances existing at the time the pleading was filed, rather than engage in hindsight. *Chicago Title & Trust Co. v. Anderson*, 177 Ill. App. 3d 615, 623 (1988). When an appellate court reviews a decision on a motion for sanctions, it should consider whether the trial court's decision: (1) was an informed one; (2) was based on valid reasons that fit the case; and (3) followed logically from the application of the reasons stated to the particular circumstances of the case. *In re Estate of Smith*, 201 Ill. App. 3d 1005, 1010 (1990).

¶ 81      First, James contends that the trial court erred when it denied his motion to strike Margaret's sanction motion for failure to identify any false statement made in James's petition. The plain language of the Rule 137, however, sets out a variety of bases for the imposition of sanctions. Ill. S. Ct. R. 137 (eff. Feb. 1, 1994). We do not interpret Rule 137 as limiting sanctions to only filings that contain false statements.

¶ 82      In this case, the trial court did not abuse its discretion when it denied James's motion to strike. Margaret's motion charged James with having neither the facts nor the proper purpose to advance the claims asserted in count II, and at the hearing on her motion, Margaret reasserted that James had filed the petition for an improper purpose. She has not alleged that James made false statements in the petition and, therefore, need not identify such statements

in her motion.

¶ 83    We note that James correctly cites *Whitmer* for the proposition that a motion for sanctions must allege which statements were false and which attorney fees stemmed from the false statements. See *Whitmer*, 335 Ill. App. 3d at 512-13. However, *Whitmer* is simply not applicable here. Because the sanction motion in that case alleged false statements and the instant case does not, *Whitmer*'s holding does not impact our decision.

¶ 84    Second, James challenges the trial court's decision "forcing [him] to carry the burden of going forward with evidence" at the September 30, 2011, hearing even though Margaret did not "present any competent evidence in support of her motion" at the July 11 hearing. Margaret denies that the court shifted any burden to James, claiming it only complied with his request for an evidentiary hearing. The record contains no transcript for the July 11 hearing; there is, however, a written order filed on July 19, 2011, which states:

> "Have John and Margaret Hanley presented a *prima facie* claim for Rule 137 sanctions against James Hanley for failure to make a reasonable inquiry that the petition seeking to find John P. Hanley a disabled adult and the petition for an order of protection against Margaret Hanley were well-grounded in fact? Yes, the court must apply an objective standard of what was reasonable under circumstances existing at the time of the alleged violations. [Citation.] *The parties will be allowed to present supplement[al] evidence and arguments relating to the circumstances existing that was not presented at the 7/11 hearing*. No additional discovery is appropriate." (Emphasis added.)

¶ 85    The order shows that the court determined that Margaret had presented a threshold case to support her motion and that the parties would be able to present further evidence and arguments on the merits at the September 30 hearing. The order complies with this court's decision in *In re Estate of Smith*, 201 Ill. App. 3d 1005 (1990).

¶ 86    In *Smith*, we held that for the trial court to properly exercise its discretion in determining whether sanctions were warranted, the claimant is to be given an opportunity to prove that the threshold requirements for sanctions are present in the case; the estate was to be given the opportunity to rebut the claimant's contentions, and both parties were to be given the opportunity to argue their respective positions. *Smith*, 201 Ill. App. 3d at 1010. James has cited no law suggesting this procedure is improper or that a burden was improperly or unfairly shifted to him.

¶ 87    Third, James alleges that the trial court abused its discretion when it imposed sanctions on him. The specific bases alleged for this claim are: granting Margaret's motion based on facts and circumstances that arose after James filed his petition; the failure of Margaret's motion to identify any false allegations in the petition; basing the decision on facts not alleged in Margaret's motion; and James's objective basis for filing his petition. James further argues, in support, that the Domestic Violence Act (750 ILCS 60/101 *et seq.* (West 2010)) does not require a petitioner to seek consent before filing a petition, that he presented sufficient evidence to support the filing of his petition, and that the court imposed sanctions because he did not prevail.

¶ 88    Looking at the trial court's order of October 4, 2011, the decision to award sanctions appears to be two-pronged. First, it finds that James's continued prosecution for an order of

protection against Margaret once John had objected was in clear contravention of section 103(2) of the Domestic Violence Act (750 ILCS 60/103(2) (West 2010)). James argues that the objection was made after the filing of the petition and cannot, therefore, properly support the imposition of sanctions for the filing. We do not agree.

¶ 89   James invoked section 103(2) (750 ILCS 60/103(2) (West 2010)) to characterize John as a "high risk disabled adult" and to authorize or validate his pursuit of the order of protection against Margaret. The statute clearly directs that "no court proceeding may be initiated *or continued*" over the objection of the claimed adult with disabilities and plainly contemplates that the person making the objection will be a high risk disabled adult, adjudicated or not. (Emphasis added.) We presume James, through his counsel, knew and understood the law on which he relied and thus presume that he knew count II had to be dismissed if/when John filed his objection. *In re Pontarelli*, 393 Ill. 310, 316 (1946). In filing the two counts at the same time, James assumed the risk that John would object and his quest for the order of protection on John's behalf would be short-circuited.

¶ 90   James did not have any right to continue his pursuit of the order of protection in the face of John's objection. See 750 ILCS 60/103(2) (West 2010). Moreover, an attorney has a duty to dismiss a lawsuit when it becomes clear that it has no viable basis. *Shea, Rogal & Associates v. Leslie Volkswagen, Inc.*, 250 Ill. App. 3d 149, 153 (1993). Here, the filing of John's objection deprived James of any legal authority to continue to seek the order of protection on his behalf and required the dismissal of count II.

¶ 91   The second prong of the trial court's decision to impose sanctions is its finding that:

   "In addition, at the hearing of 9/30/11 or at no prior hearing, did petitioner present even an iota of evidence suggesting any component of abuse, neglect, harassment, exploitation, or interference with personal liberty."

¶ 92   We find the above finding logically flows from Margaret's allegations in the motion for sanctions that "James Hanley had neither the facts nor the proper purpose to pursue the claims advanced in this case" and "[w]ith no more than conclusory allegations which, when tested, have been demonstrated to be completely without substance or merit, and with an undisclosed conflict of interest *** James Hanley has abused the processes of this court."

¶ 93   Margaret's motion for sanctions recounted a long and contentious history of family division and dysfunction, claimed that continuing this animus was the real purpose of James's petition, and asserted that his allegations were without foundation, substance or merit. James insists that there was an objective basis for the filing of count II which precludes the imposition of sanctions.

¶ 94   The record shows that in 1992 John indicated that he no longer wanted to speak with James and that James, assertedly out of respect for his father, had not spoken with him in the 18 years since that time. James's testimony supporting his request for an order of protection against Margaret largely consisted of multilayered hearsay reports of others that evidently caused James to become "concerned" that Margaret was isolating John from his family and friends and seeking to gain control of Lucas for her own financial gain. James acknowledged, however, that John simply may not have wanted to speak with the estranged family members who approached him in public.

¶ 95       While his petition was largely based on reports from estranged family members with whom John has long indicated he wants no contact, James did testify to some information gleaned from others: John's friend Dave Armitage told him that either Margaret or Maureen told him that he could take John to lunch but could not do so alone; Margaret handed Andy a check drawn on Jack's personal account and told him that it was for his stock; the Peoria school board owned the land on which Lucas was located and sold it to a company allegedly owned by Margaret; some contractors and material suppliers told him that HM Stearn Ironworks, LLC, was allegedly co-owned by Margaret and managed by two employees of Lucas–one of whom was Heather McCord; Andy told James that an unnamed friend of that same Heather McCord had told him that Heather quit her job at Lucas because Margaret had asked her to do something she did not think was right; he was told that Lucas had received women's business certification, which allegedly required a woman to be a 51% owner; and he heard that Lucas had received a stimulus grant to work on steel beams for the wind energy market but he learned there were no steel beams in wind towers and was concerned the company might have been used to misrepresent itself to do work that does not actually exist.

¶ 96       This tenuous and gossipy compendium, without more, seemed enough to James to warrant a conclusion that John needed protection from Margaret and that he should seek to have his father declared mentally impaired and his sister branded a domestic abuser. We can see that some of this information might generate a concern that would lead a reasonably objective person to try to gather some real facts, but James admitted at the hearing that, beyond the testimony he presented, he did no investigation into his father's need for a guardian or for a court order to protect John from Margaret. We do not believe a reasonable person unaffected by the prevailing family animus or competitive business interests would have thought that information, without more, constituted a well-founded basis for bringing the instant action.

¶ 97       Clearly the trial court did not. Nor can we say that no reasonable person would agree with the court's finding that there was no iota of evidence–as opposed to speculation and innuendo–that Margaret was exploiting, abusing, neglecting, or harassing John or interfering with his liberty. Consequently, we do not find that the trial court abused its discretion when it found sanctions warranted on this basis.

¶ 98       Fourth, James attacks the propriety of awarding fees and costs to Margaret for work performed to advance the interests of Lucas and paid for by the company. In responding to this claim, Margaret points out that she testified that she would have to reimburse Lucas from any award she received.

¶ 99       In support of his contention that the trial court abused its discretion when it imposed the instant attorney fee award, James cites only to Rule 137, and does so for the proposition that the trial court has the authority to award attorney fees as a sanction. His brief is totally devoid of citation to any authority indicating that the trial court abused its discretion because someone other than Margaret initially paid her fees. Nor does James cite any authority to support his contention that the trial court erred when it did not permit his counsel to question Margaret's counsel.

¶ 100      Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008) mandates that an appellate brief

must contain argument with citation to appropriate authority. The burden of argument and research is on the appealing party and not on the appellate court. *Williams v. Danley Lumber Co.*, 129 Ill. App. 3d 325 (1984). Any issue that has not been properly presented for review may be deemed waived. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008); *Universal Casualty Co. v. Lopez*, 376 Ill. App. 3d 459, 465 (2007). We find this claim to have been waived by James.

¶ 101    Accordingly, we hold the trial court did not abuse its discretion in imposing sanctions upon James.

¶ 102                        III. Margaret's Cross-Appeal on Sanctions

¶ 103    Margaret submitted two fee petitions. The first, in the amount of $42,596.24, covered the period from November 1, 2010, through September 30, 2011; the second covered work between October 1, 2011, and November 30, 2011, and totaled $4,741.42. James objected to portions of the claimed fees and submitted a document to the court entitled "Petitioner's Annotations to David & Campbell L.L.C. Invoices" on which its objections are identified by labeled red boxes in the left margin and yellow highlighting. The annotations included both the original and the supplemental fee petitions. As the trial court indicated in a footnote in its order, it designated deductions from the invoices "relating to pending appeal or not reasonably related to the instant litigation" by blue marks on the petitioner's annotations. These deductions were taken from both fee petitions and totaled $12,951.41.

¶ 104    Margaret argues that the trial court made a "mathematical" error when it inadvertently omitted her supplemental petition for fees and costs from its calculation of the amount of attorney fees owed to her. James counters that (1) the determination of the amount of the award was an exercise of the court's discretion and should not be disturbed absent a clear abuse of that discretion, citing *Alcantar v. Peoples Gas Light & Coke Co.*, 288 Ill. App. 3d 644, 650-51 (1997), and (2) Margaret's failure to ask the trial court to clarify its ruling should stand as a bar to her cross-appeal.

¶ 105    The challenged calculation, as shown in the trial court's order, is:

"Gross fees and costs request:                                    $42,596.24

Minus fees and costs relating to pending appeal

or not reasonably related to the instant litigation:    $12,951.41

Fees and costs awarded                                         $29,644.83"

¶ 106    Only Margaret's original fee petition seeking $42,596.24 is represented in the "gross" request; her supplemental petition for $4,742.41 is not included. She asks this court to correct this "inadvertent" error, pursuant to Illinois Supreme Court Rule 366 (eff. Feb. 1, 1994). In so doing, she is not challenging the trial court's exercise of discretion but is contending that the court made a "mathematical" error.

¶ 107    For the following reasons, we are persuaded the trial court did inadvertently err and its error was a scrivener's omission rather than an exercise of its discretion or an error in arithmetic.

¶ 108    First, the title "*Gross* fees and costs request" suggests an intent by the court to begin the calculation by setting out the entirety of Margaret's claim for fees/costs and then deducting

-19-

those the court considered inappropriate from that amount. (Emphasis added.) Second, using James's annotated document, it made deductions from *both* fee petitions; however, the document itself does not indicate there are two petitions or where the break between them falls. Third, if the court intended to disallow the supplemental petition in its entirety, it would not have stricken three individual charges from it because, by doing so, it would have made those deductions twice.

¶ 109 The resolution of this issue would have been far simpler if Margaret had filed a motion to reconsider in the trial court and she should have done so. It is, however, not a bar to relief in this court that she did not. Rule 366(b)(3)(ii) provides that "[n]either the filing of nor the failure to file a post-judgment motion limits the scope of review" of nonjury civil matters by the appellate court. Ill. S. Ct. R. 366(b)(3)(ii) (eff. Feb. 1, 1994). As it seems clear to us that the court intended, in setting out "gross fees and costs request," to include all of the fees sought by Margaret, we elect to use our authority under Rule 366 to make that sole correction. We hold that the following calculation of Margaret's fee award is the correct one:

| | |
|---|---|
| Gross fees and costs request: | $47,337.66 |
| Minus fees and costs relating to pending appeal or not reasonably related to the instant litigation | 12,951.41 |
| Fees and costs awarded | $34,386.25 |

¶ 110       IV. Margaret's Motion for Rule 375(b) Sanctions

¶ 111 Margaret has sought sanctions against James under Illinois Supreme Court Rule 375(b) (eff. Feb. 1, 1994). Under Rule 375(b) sanctions may be imposed if an appeal is frivolous or not taken in good faith. Ill. S. Ct. R. 375(b) (eff. Feb. 1, 1994). An appeal is considered frivolous if it is "not reasonably well grounded in fact and not warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law." Ill. S. Ct. R. 375(b) (eff. Feb. 1, 1994).

¶ 112 Margaret frames her request for Rule 375(b) sanctions as follows:

"The underlying case is baseless, is in direct contravention of the applicable statute, and has never been supported with 'even an iota of evidence.' It is equally frivolous here on appeal. Because the appeal is not reasonably well-grounded in fact and is not warranted by existing law or a good faith argument to the contrary, sanctions should be imposed pursuant to Supreme Court Rule 375(b)."

¶ 113 James insists that, because his petition for guardianship was still pending, the statutory requirement did not apply in this case. He characterizes the point of this appeal as follows:

"The question that is squarely presented is whether a party who has sought the appointment of a guardian may pursue an order of protection over the disabled adult's objection *during the pendency of the guardianship proceedings*," (Emphasis in original.)

We have already found that the answer to James's question is "no." *Supra* ¶¶ 72-73. The difference in our consideration of Rule 375 sanctions, however, is that there was no case law that was squarely on point at the time James filed his appeal. The parties have not cited, nor have we found, any case directly addressing and answering whether a person who has

simultaneously filed a petition for guardianship of an alleged disabled adult and a petition on behalf of that disabled adult for an order of protection against an allegedly abusive third person is required to dismiss the latter claim if the disabled person objects, even if the guardianship claim is still pending.

¶ 114 We believe James's appeal with regard to count II of his petition can be fairly read as seeking a clarification of the law where there is silence and/or seeking a modification of the trial court's interpretation of the requirement of the statute. Either purpose is sufficient to avoid the penalty of Rule 375(b). Consequently, Margaret's request for sanctions on appeal is denied.

¶ 115                                     CONCLUSION

¶ 116 The trial court's dismissal of both counts of James's petition for guardianship and order of protection is affirmed. The trial court's imposition of sanctions upon James for his continued pursuit of the order of protection after John objected to its continuation is affirmed. The trial court's inadvertent error in calculating the amount of the sanction award to Margaret is corrected pursuant to supervisory authority. Margaret's motion for sanctions for James's pursuit of this appeal is denied.

¶ 117 Affirmed in part, corrected in part, and sanctions on appeal denied.